UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11495-RWZ

BERNKOPF GOODMAN LLP

v.

WARREN J. HEBERT, *et al.*

<u>MEMORANDUM OF DECISION</u>

March 5, 2013

ZOBEL, D.J.

Plaintiff Bernkopf Goodman LLP ("Bernkopf") alleges that defendants Warren J.

Hebert ("Warren") and Carolyn M. Hebert ("Carolyn") stole more than $500,000 that

Bernkopf had entrusted to them for federal employment tax payments. Bernkopf sues

not only the Heberts, but also Cornerstone Community Bank ("Cornerstone") and RBS

Citizens, N.A. ("Citizens"), two banks through which Bernkopf's money passed.

Cornerstone and Citizens now move to dismiss the counts alleged against them for

failure to state a claim.

**I. Background**[1]

Bernkopf is a law firm based in Boston. In 1999, Bernkopf hired CheckMaster

Payroll Service ("CheckMaster") to pay its weekly federal and state employment taxes,

to issue payroll checks, and to file quarterly federal and state tax returns. CheckMaster

---

[1] As appropriate on a motion to dismiss, the facts are taken as alleged in the complaint.
See <u>Ocasio-Hernandez v. Fortuno-Burset</u>, 640 F.3d 1, 4 (1st Cir. 2011).

was a business owned and operated by Warren and Carolyn and based in Rhode Island.

CheckMaster operated through accounts at Cornerstone, based in Tennessee, and Citizens, based in Rhode Island. Cornerstone provided transfer services through the Automatic Clearing House (ACH) network,[2] while Citizens held CheckMaster funds deposited in two accounts designated "Tax" and "Trust."

The payroll processing system worked as follows: CheckMaster transferred weekly payments from Bernkopf's operating account (at TD Bank), through Cornerstone, to CheckMaster's accounts at Citizens. CheckMaster was then supposed to make Bernkopf's tax payments by transferring money from its Citizens accounts back through Cornerstone to the IRS. In 2010, however, CheckMaster stopped sending Bernkopf's tax payments through Cornerstone to the IRS. Instead, CheckMaster simply kept Bernkopf's money.

The IRS alerted Bernkopf in 2011 that it had not received Bernkopf's tax returns or tax payments for the second, third, and fourth quarters of the previous year. Bernkopf spoke with Warren, who insisted that he had properly filed the returns and payments and that he would resolve the matter. He subsequently provided falsified documents to Bernkopf and to the IRS to confirm that he had made the payments. The IRS remained unsatisfied.

Bernkopf met with Warren on August 11, 2011. At that meeting, Warren

---

[2] The ACH network processes large volumes of electronic financial transactions under the oversight of NACHA (previously the National Automated Clearing House Association). See Intro to NACHA, NACHA, https://www.nacha.org/intronacha (last visited Feb. 28, 2013).

informed Bernkopf that CheckMaster was operated entirely by him and his wife, that it was never incorporated, and that he personally had no liability insurance. He continued to insist, however, that he had made the promised tax payments. He subsequently provided falsified bank records to back up his assertions.

Out of patience, Bernkopf filed this suit on August 23, 2011. It named not only Warren and Carolyn as defendants, but also Cornerstone and Citizens. It asserted (inter alia) that Cornerstone and Citizens were negligent for failing to ensure that Bernkopf's tax payments were sent to the IRS. Carolyn and Citizens moved to dismiss the original complaint; while those motions were pending, Bernkopf filed an amended complaint. Cornerstone and Citizens now move to dismiss the amended complaint.

## II.  Legal Standard

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court accepts as true all factual allegations contained in the complaint, but not legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). If the complaint's factual allegations fail to state a plausible claim, the complaint must be dismissed. Id. at 679.

## III.  Analysis

Cornerstone and Citizens each move to dismiss the claims against them in the amended complaint. The amended complaint asserts four theories of liability against these defendants: negligence (Counts XI-XII), breach of fiduciary duty (Counts XIII-XIV), breach of contract (Counts XV-XVI), and violation of Mass. Gen. Laws ch. 93A (Count VI). In its opposition to each bank's motion to dismiss, Bernkopf voluntarily

dismisses its breach of contract and Chapter 93A claims. It additionally presents no persuasive argument on its fiduciary duty claim against Cornerstone,[3] and no argument whatsoever on its fiduciary duty claim against Citizens. Thus, the only remaining claim by Bernkopf against Cornerstone and Citizens is for negligence.

The parties dispute which state's law applies to Bernkopf's claims. Each party advances the law of its home state—Massachusetts for Bernkopf, Tennessee for Cornerstone, and Rhode Island for Citizens. I need not resolve the question, however, because Bernkopf's claims must be dismissed regardless of whose law applies.

In order to state a claim for negligence, Bernkopf must show that it was owed a duty of care. See 74 Am. Jur. 2d Torts § 10. The parties agree that a bank generally has no duty to monitor the activities of authorized account-holders and prevent misappropriation. See, e.g., Go-Best Assets Limited v. Citizens Bank of Massachusetts, 972 N.E.2d 426, 431 (Mass. 2012). However, Bernkopf argues that an exception to that rule applies here. Citing New York law, Bernkopf claims that where a bank knows a particular account is held by a depositor in a fiduciary capacity for a principal, the bank has a duty to the principal if it has actual knowledge or notice that funds in the account are being misappropriated. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 287-88 (2d

---

[3] As to the latter, Bernkopf argues only that "[u]nder Tennessee law, a bank that knows its depositor is holding funds in its accounts as a fiduciary . . . itself also owes a fiduciary duty to the depositor's principals which is 'akin to a fiduciary duty.'" Docket # 67, at 6-7 (quoting Chambers v. First Trust & Sav. Bank, No. 030A1-9108-CH00293, 1992 WL 40191, at *4. (Tenn. Ct. App. Mar. 4, 1992)). The argument is meritless. In the quoted section, Chambers held only that a quasi-fiduciary relationship was created when a bank's vice-president personally acknowledged court-ordered restrictions on permissible withdrawals when opening guardianship accounts for two minor children. Id. No such circumstances are present in this case, and Bernkopf cites no other authority for the asserted fiduciary duty. Indeed, as Chambers itself recognizes, Tennessee law generally places no duty whatsoever on a bank toward a fiduciary depositor's principal absent "actual knowledge that the fiduciary is committing a breach of his obligation . . . or . . . bad faith." Id. at *2 (quoting Tenn. Code Ann. § 35-2-107).

Cir. 2006).

To show that defendant banks had actual knowledge or notice of CheckMaster's

misappropriation, Bernkopf makes the following factual allegations. As to Cornerstone,

Bernkopf alleges:

(1) Cornerstone and CheckMaster entered into an agreement for ACH transfer
services under which Cornerstone was to transfer tax payments from customers
to CheckMaster and then from CheckMaster to the IRS.

(2) Cornerstone transferred some funds from customers to CheckMaster that it did
not subsequently transfer from CheckMaster to the IRS.

(3) Cornerstone communicated directly with Warren about irregularities in making
tax payments to the IRS.

As to Citizens, Bernkopf alleges:

(1) Citizens maintained two accounts for CheckMaster, designated "Tax" and
"Trust."

(2) These accounts showed a pattern of weekly or bi-monthly deposits without
corresponding debits, and occasional withdrawals of large sums.[4]

(3) The "Tax" account also shows other large withdrawals that Bernkopf claims were
used to settle lawsuits similar to the present one.[5]

(4) Citizens was served with a search warrant in September 2010 requiring it to
provide the Rhode Island State Police with CheckMaster's account records.

---

[4]For instance, the "Tax" account shows $336,000 in periodic deposits from Seekonk Supply, with
only $92,000 in corresponding debits and a six-month period of few or no corresponding debits. It
likewise shows $325,000 in deposits from High Tech Turning, with only $73,000 in corresponding debits
and seven months of few or no corresponding tax debits. Bernkopf alleges a similar pattern was repeated
with respect to other customers.

[5] For instance, the "Tax" account paid $7,450 to the client escrow of law firm Revens, Revens
and St. Pierre ("Revens") to settle a suit with CheckMaster customer Aspects, Inc.; it paid $133,418.96 in
April 2010 and $2,246.37 in October 2010 to settle a suit with CheckMaster customer Mount St. Rita
Health Centre; and it paid checks totaling $182,701.54 to settle a suit with CheckMaster customer Scott
Motors. Likewise, the account shows a withdrawal of $255,000 on September 23, 2010, and Citizens
issued two corresponding checks to the Revens on the same date. One check for $250,000 was
deposited to Revens' client fund escrow for settlement of a claim by Seekonk Supply, and one check for
$5,000 was paid to Revens for legal fees.

(5) Citizens initially froze the accounts in response to the search warrant, then released the funds after Warren threatened legal action.
(6) A branch manager at Citizens had knowledge of other lawsuits or threatened lawsuits concerning CheckMaster, and had communications with Warren.

Even if <u>Lerner</u> applied here, these allegations would fail to state a claim. The Second Circuit in <u>Lerner</u> held that a bank may be liable under New York law if it has "notice or knowledge" that a fiduciary is misappropriating funds from a fiduciary account. 459 F.3d at 287 (quoting <u>In re Knox</u>, 477 N.E.2d 448, 451 (N.Y. 1985)). It repeated, however, that this liability was an exception to the general rule. <u>See id.</u> at 287 ("As a general matter, 'a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation.'" (quoting <u>Norwest Mortgage, Inc. v. Dime Sav. Bank of N.Y.</u>, 721 N.Y.S.2d 94, 95 (App. Div. 2001)). Likewise, <u>Lerner</u> emphasized that "[t]he bank has the right to presume that the fiduciary will apply the funds to their proper purposes under the trust." <u>Id.</u> (quoting <u>Bischoff ex rel. Schneider v. Yorkville Bank</u>, 112 N.E. 759, 760 (N.Y.1916)). A bank loses the right to this presumption only when faced with "circumstances which reasonably support the <u>sole inference</u> that a misappropriation is intended." <u>Id.</u> (emphasis added) (quoting <u>Bischoff</u>, 112 N.E. at 761).[6]

The <u>Lerner</u> plaintiffs stated a claim by alleging the defendant banks there knew facts that supported the "sole inference" of misappropriation. But the facts alleged in

---

[6] A few lines later in the opinion, <u>Lerner</u> parenthetically quoted language from <u>Norwest Mortgage</u> stating that "[f]acts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated" could trigger a duty of care. 459 F.3d at 288 (quoting 721 N.Y.S.2d at 95). I agree with the Fifth Circuit that generally speaking, the underlying facts will only be "sufficient to cause a reasonable person to suspect" if they support the "sole inference" of misappropriation. <u>See</u> <u>Chaney v. Dreyfus Serv. Corp.</u>, 595 F.3d 219, 233 (5th Cir. 2010).

that case were a far cry from those alleged here. In <u>Lerner</u>, an attorney named Schick

solicited millions of dollars from investors for a get-rich-quick scheme. He deposited

those funds in IOLA[7] escrow accounts. Under New York's IOLA system, the banks

administering these accounts—Fleet, Sterling, and Republic—had agreed to report to

the state IOLA fund any overdrafts on those accounts. <u>Id.</u> at 279-280. That, however,

they failed to do. When Schick began writing overdrafts on his IOLA accounts with

Fleet—having embezzled a substantial amount of the money he had deposited—Fleet

simply extended him "automatic loans" to cover the insufficient funds. <u>Id.</u> at 281.

Eventually, the Fleet branch manager confronted Schick about the overdrafts. Schick

responded that if Fleet bounced his checks and reported him to the state IOLA fund, he

would be disbarred and would be unable to bring Fleet any more business. (At the time,

Schick was depositing an average of $60 million to $80 million per month with the

bank.) Fleet would also be stuck with the "automatic loans" it had already extended

him. To avoid that outcome, Fleet agreed not to report any bounced checks by Schick,

and to respond to any inquiries about the overdrawn IOLA accounts by saying they had

"double-digit million-dollar balances." <u>Id.</u> at 282. Fleet additionally agreed to mark

Schick's bounced checks as "Refer to Maker" to avoid suspicion. The other banks

adopted similar mechanisms to hide Schick's overdrafts. <u>Id.</u> at 282-83.

      The facts alleged in <u>Lerner</u> thus showed unmistakably that the banks were

aware of suspicious circumstances giving rise to the "sole inference" of

---

[7] IOLA stands for "Interest On Lawyer Account," the same mechanism known in other jurisdictions as IOLTA ("Interest On Lawyers' Trust Account"). The interest earned on these accounts is given to the state for charitable purposes, often providing civil legal services for the indigent. See <u>Brown v. Legal Found. of Wash.</u>, 538 U.S. 216, 220-223 (2003).

misappropriation. Schick drew repeated overdrafts on accounts explicitly marked as fiduciary; and when the banks confronted him about these overdrafts, he recruited them to conceal the insufficient funds. On such extreme facts, it was appropriate to find that the banks breached a duty of care towards Schick's investors by failing to expose the misappropriation. See id. at 289-90; cf. Go-Best, 972 N.E.2d at 237 ("If presented with comparable facts, we, too, would likely allow a negligence claim to proceed.").

But as Lerner recognized, less extreme facts generally will not state a claim. Overdrafts in fiduciary accounts are "particularly probative in signaling misappropriation"; indeed, that is precisely why the banks in Lerner were required to report overdrafts on IOLA accounts. Id. at 288. But even overdrafts will not always provide sufficient notice of misappropriation, if they are only small or occasional. Id. Furthermore, the banks' active participation in concealing Schick's activities weighed heavily in showing that they had sufficient notice of misappropriation. See id. at 290.

Here, by contrast, Bernkopf does not allege that CheckMaster overdrew its accounts at Cornerstone or Citizens. Nor does it allege that either bank actively concealed any misappropriation by CheckMaster. Instead, Bernkopf claims that Cornerstone and Citizens should have monitored CheckMaster's transfers into and out of its accounts, noticed a suspicious pattern of debits and credits, and realized (even though CheckMaster never overdrew its accounts) that CheckMaster was misappropriating funds. Bernkopf cites no case extending a bank's duty of care so far. See Chaney, 595 F.3d at 234 ("The Receivers have cited no cases suggesting some broad duty for financial institutions to monitor all their accounts for suspicious activity

and to investigate that activity upon discovery. We will certainly not act to impose such an expansive obligation.").[8] Bernkopf alleges additional facts that help its case somewhat: unspecified communications between Cornerstone and Warren about irregularities in CheckMaster's tax payments, the search warrant served on Citizens and its temporary freeze on CheckMaster's accounts, an unspecified Citizens branch manager with knowledge of other lawsuits against CheckMaster, and unspecified communications between that branch manager and Warren. But even taken as a whole, and combined with the alleged suspicious activity in CheckMaster's accounts, these allegations come nowhere near the extreme facts of Lerner. As a matter of law, these facts did not raise the "sole inference" that CheckMaster was misappropriating Bernkopf's funds. Cornerstone and Citizens thus had no duty of care towards Bernkopf.

Furthermore, even if Bernkopf's allegations sufficed to meet the Lerner standard, its burden is likely even higher than that. In Massachusetts, the Supreme Judicial Court recently decided that a duty of care to non-customers only arises if a bank has "actual knowledge of an intended or apparent misappropriation of funds." Go-Best, 972 N.E.2d at 431. Likewise in Tennessee, a bank only owes such a duty if it has "actual knowledge that the fiduciary is committing a breach of his obligation" or "knowledge of such facts that its action . . . amounts to bad faith." Tenn. Code Ann. § 35-2-107; see also McLemore v. Regions Bank, 682 F.3d 414, 425 (6th Cir. 2012). Even if Bernkopf's

---

[8] The closest Bernkopf comes is Newton v. Scott, a case from the New York Appellate Division decided in 1938. 254 A.D. 140 (1938). In that case, however, the bank at issue was small, and the fiduciary's transactions were observed by the bank's secretary "practically every day." Id. at 144. Thus, even assuming Newton remains good law, it is distinguishable. And to the extent that Bernkopf draws support from Fine v. Sovereign Bank, Civil Action No. 06-11450-NG, 2011 WL 2134380 at *6 (D. Mass. May 27, 2011), the rule applied there has since been clarified by the Supreme Judicial Court of Massachusetts. See Go-Best, 972 N.E.2d 426.

allegations did show Cornerstone and Citizens had some notice of CheckMaster's misappropriation, they certainly do not show actual knowledge or bad faith. See Go-Best, 972 N.E.2d at 432 ("[A] risk of misappropriation is not enough to support an inference that the bank had actual knowledge . . . ."); McLemore, 682 F.3d at 425 ("[T]he district court held that only plaintiffs' allegations of 'knowing' or 'bad faith' conduct survived. Plaintiffs do not quarrel with this conclusion.").

As for Rhode Island, its courts apparently have not yet considered whether a bank owes any duty in the circumstances presented here. Cf. Volpe v. Fleet Nat'l Bank, 710 A.2d 661, 664 (R.I. 1998) (a bank "owes no duty of care to a noncustomer with whom it has no relationship" absent "extraordinary circumstances"). Even if Rhode Island were to adopt the Lerner rule, however, Bernkopf's allegations fail that standard for the reasons described above.[9]

## IV.  Conclusion

Because Bernkopf fails to allege facts showing that Cornerstone and Citizens owed it a duty of care, the banks' motions to dismiss the counts against them in the amended complaint (Docket ## 53 and 57) are ALLOWED, and those counts are DISMISSED. Carolyn's and Citizens' motions to dismiss the counts against them in the original complaint (Docket ## 35 and 44) are DENIED AS MOOT.

____ March 5, 2013 ____          ____ /s/Rya W. Zobel ____

---

[9] Given this conclusion, I need not decide whether Bernkopf has sufficiently alleged that CheckMaster's accounts at Citizens were fiduciary accounts, or whether Cornerstone and Citizens had notice or knowledge of that fact. See Chaney, 595 F.3d at 233-34. I also need not reach the alternative arguments raised by Cornerstone and Citizens under the law of the case, judicial estoppel, and the economic loss doctrine.

DATE                                    RYA W. ZOBEL
                                UNITED STATES DISTRICT JUDGE